THE OSCEOLA.

THE NANNIE LAMBERTON.

EMERY v. THE OSCEOLA AND THE NANNIE LAMBERTON.

(*District Court, S. D. New York.* April 14, 1892.)

COLLISION—NARROW CHANNEL—TIDE—RIGHT OF WAY—WHEN DUTY TO STOP.
    Where two tows are approaching each other in a narrow channel in such wise that by continuing on they will meet at a point where it is difficult and dangerous for them to pass, it is the duty of the tow going against the tide to stop before reaching such difficult point, and wait for the other tow to go by her.

In Admiralty. Collision between tows.
*Hyland & Zabriskie*, for libelant.
*Carpenter & Mosher*, for the Nannie Lamberton.
*Benedict & Benedict*, for the Osceola.

BROWN, District Judge. At about 9 o'clock in the evening of September 12, 1891, a collision occurred between the tow of the tug Nannie Lamberton, going up the Hudson river with the flood-tide, and the tow of the tug Osceola, coming down river, by which the libelant's canalboat, the Nell Stone, sustained damages, to recover which the above libel was filed.

The collision occurred in the narrow channel-way about 400 feet wide, between the "Stone Light," so-called, on the west side of the Hudson river a fifth of a mile above Van Wie's point, five miles south of Albany, and the opposite ledge of rocks buoyed in mid-river, which there forms the easterly line of the channel. The Lamberton's tow consisted of about 30 boats, 3 or 4 abreast, towed by 2 hawsers, each about 90 fathoms in length. The libelant's boat was the extreme port boat in the third tier. The tow of the Osceola consisted of 3 barges in the front tier, in all about 92 feet wide, with 37 canal-boats in 9 tiers behind, towed upon hawsers about 100 fathoms in length. The port barge of the forward tier was loaded with lumber, and struck the libelant's boat about amid-ships on her port side. The lights of the two tows were seen by each other when about a mile and a half apart, the Lamberton then being about off Staats, about a mile below the light, and the Osceola about 3,000 feet above the light, where there was at that time a government drill occupying a part of the channel-way. There is a straight reach of about half a mile from the Stone light up towards the drill, with a channel-way 300 or 400 feet wide, of sufficient depth for such tows as these. In going up the channel-way boats turn a little to port in passing Staats, then a little to starboard in going between the light and the buoyed rocks.

It is not often that tows meet in that vicinity. Between Van Wie's and the drill the channel is unfavorable for tows to meet and pass. The strong weight of evidence, moreover, is that the meeting and passing of tows abreast of the light, or abreast of the drill, must by some means be avoided as dangerous; though some rare instances are mentioned in which tows have passed there without damage. The nearly unanimous testimony of the witnesses is also that in order to avoid meeting or passing at either of those places, the tow going against the tide should stop and wait above the drill or the light in order to allow the tow going with the tide to pass. This is in accordance with the usual and well-established rule as to the right of way in such cases.

The Osceola had already reached the drill when she saw the Lamberton a mile and a half below, off Staats. It was not proper for the Osceola to stop and wait at the drill by dropping back; and she, therefore, properly pulled ahead till her tow passed the drill. The Lamberton, recognizing the Osceola's situation, stopped her engine when a little above

Staats and drifted in the flood-tide, in order to give the Osceola's tow time enough to pass the drill, but expecting that she would stop in the straight stretch between the drill and the light. When the Osceola's tow had passed the drill, the pilot of the Lamberton gave a signal of one whistle, and the Osceola answered with one; the Lamberton thereupon started ahead, and the tows met abreast of the light, as above stated.

It was the duty of the Osceola to stop before reaching the light. Her answer was evidently drawn in recognition of that duty, for it avers that the "Osceola continued on her course slowly till she had passed" the drill "and then *stopped* to let the Lamberton pass," but that she continued on after seeing that the Lamberton had stopped. The evidence, however, shows that the Osceola did not stop before she reached the light, but kept on till she reached a point near the shore 600 or 700 feet below the light, although before she reached the light the Lamberton's whistle was heard and answered. The captain says he could have stopped before he reached the light had he chosen to do so. When the Osceola came to a stand-still, about 600 or 700 feet below the light, the forward tier of her tow was between the light and the buoy. There were two other tugs abreast of the Osceola assisting her, and all their officers testify that the tug on the westerly side when she came to a stand-still was actually aground, and that the three tugs were close along-side of each other; that the barges were apparently directly astern, and the tow in line. The Lamberton in coming up passed the three tugs at about the time they came to a stand-still and at a good distance from them, heading somewhat over towards the easterly side of the channel-way, and she passed, as I find upon her testimony, as near to the buoy on the rocks as was proper or safe.

The Lamberton's tow while she stopped and drifted had become somewhat irregular. Her witnesses, however, say that before passing the Osceola's tow the Lamberton's tow had got straightened up; and no witnesses for the Osceola testify to any irregularity in the line of the Lamberton's tow as she approached them before collision. The tug Ronan was on the Osceola's port side. Her pilot testifies that the forward tiers of the Lamberton's tow passed some little distance away from the Ronan, heading a little across the stream to the eastward. This accords with the testimony of the pilot of the Lamberton, that he went as near the buoy as possible; and unless that was substantially true, I do not see how that heading of the tow could have been given to it and maintained. The last four or five tiers of the Lamberton's tow, however, rubbed along against the Ronan, while the port side of the libelant's boat in the third tier collided with the Osceola's barge 600 feet above.

There seems to be no dispute concerning most of the above facts, except as to the distance at which the Lamberton passed the buoy. No explanation of the collision consistent with them has been offered, except that of the witnesses Noble and Atherton, in behalf of the Osceola, who testify that it is dangerous to pass abreast of the light, because the flood-tide sets towards the light, and if the tow going up with the flood gets any swing to the westward, it is impossible to stop it. This account for

the fact that the latter half of the tow rubbed along against the Ronan, while the front went well clear, heading to the eastward, as well as for the continued set of the forward tiers towards the westerly shore, notwithstanding the fact that the Lamberton was doing all she could to prevent it, and that the boats were heading somewhat across to the eastward.

Another circumstance tending to explain the collision appears in the testimony of Atherton. He was the pilot in charge of the tug Hazel Dell, a helper of the Osceola, who says that after passing the drill, he came along the east side of the Osceola's tow for the purpose of keeping it close to the dike; and that while doing so, he was hailed by the tow on the other side not to push any further or they would be on the dike. But he also testifies that he heard the crash of the collision, that he immediately went to it, and that he *worked his way* through on the east side by *shoving over the forward boats* of the Osceola's tow towards the westerly shore. He also says that some boats of the Lamberton's tow drifted *over the buoy*. These circumstances show that whatever may have been the position of the middle or tail-end of the Osceola's tow, the forward tier which struck the libelant's boat had not been over on the westerly side of the channel, as is claimed by the respondent, and that the Lamberton's tow must have been near the buoy. The force of the blow would have tended to set the barges somewhat towards the westerly shore before the Hazel Dell came up; yet when she arrived, she shoved them over further yet.

The captain of the Osceola claims that nothing was added to the difficulty of the Lamberton's tow in passing his own tow, by going, as he did, a few hundred feet below the light before stopping, although that brought the forward tier of his tow abreast of the light; because, as he says, there was quite as much breadth of water abreast of the light as above it. According to other testimony, however, the difficulty there is not alone in the narrowness of the channel-way, but also from the bend in the channel, and in the set of the flood-tide towards the light; so that it is difficult, if not impossible, to go around the buoyed rocks without swinging the tail of the tow to the westward. This must have been well known to the Osceola; and for this reason, according to the great weight of the testimony, the Osceola should have stopped before reaching the light. This accords not only with the implication of the Osceola's answer, but with the expectation and the signal of the Lamberton. After the Lamberton's tow coming up had passed the light and got into the straight reach above it, there would be no further swinging of the tow; and a straight course and a safer passage would become practicable, though the channel was no broader than abreast of the light.

Had the Osceola stopped before she reached the light, her tow could have laid just as easily between her and the drill, and with much less danger of collision. On the weight of testimony upon this point, and the captain's statement that he could have made this stop had he thought best, I must find that it was his duty to do so, under the rule that gives the right of way to the vessel going with the tide. He could have done this, as he says, after the exchange of signals and after he saw

that the Lamberton had resumed her forward motion. The answer of one whistle that he gave her imported, under the circumstances, the same duty. It was an acquiescence in her coming forward; and in doing so she had the right of way. Had he wished not to acquiesce, he should have given several short blasts to indicate it; and in agreeing to the Lamberton's coming on, it was his duty to stop in the safer place above the light. The Lamberton, having the right of way, was not required to wait longer below drifting upwards, even if she could have safely done so, which is at least doubtful; the evidence on that point is hardly sufficient to form a certain judgment.

As I do not find the Lamberton, therefore, in fault, the libelant is entitled to a decree against the Osceola only, with costs; and as against the Lamberton, the libel should be dismissed, with costs.