**NEWTOWN CREEK TOWING CO. et al.
v. THE CHRISTINE MORAN et al.
and three other cases.**

THE CORAL SEA.

A. Nos. 163–193, 166–262,
164–85, 167–73.

United States District Court.
S. D. New York.

Oct. 7, 1953.

Alexander & Ash, New York City, proctors for libelant, Newtown Creek Towing Co. and others for claimant of Tug Coral Sea. Edward Ash and John A. Lyon, New York City, of counsel.

Kirlin, Campbell & Keating, New York City, proctors for the Tug Christine Moran, Tug Claire A. Moran, Inc., and

Moran Towing & Transportation Co. Inc. Edwin S. Murphy, New York City, and Paul F. McGuire, Bayonne, N. J., of counsel.

Lloyd, Decker, Williams & Knauth, New York City, proctors for respondent Seaboard Shipping Corp. as owner of the Barge Seaboard No. 99. Gray Williams, New York City, of counsel.

Macklin, Speer, Hanan & McKernan, New York City, proctors for libelant Cities Service Oil Co. in admiralty action No. 166–262. Charles J. Carroll, Jr., New York City, of counsel.

Platow & Lyon, New York City, proctors for Tug Coral Sea in admiralty action No. 167–73. John A. Lyon, New York City, of counsel.

WEINFELD, District Judge.

A collision between two barges, the oil barge Russell-Poling No. 27 in tow of the tug Coral Sea, and the oil barge Seaboard No. 99 in tow of the tug Christine Moran, gives rise to these consolidated libels. The collision occurred on October 16, 1949 at 9:40 P.M. in the New London Harbor at the southerly end of the Thames River Channel where the river empties into Long Island Sound. The tug Christine Moran, with The Seaboard No. 99 in tow, was outbound from New London heading in a southerly direction down the Thames River into the Sound. The tug Coral Sea with her tow, the barge Russell-Poling No. 27, was entering the harbor on a rounding course passing close to Sarah Ledge Buoy on her port side, en route to an anchorage to the west of the channel.

The collision resulted in four different libels which were consolidated and tried together as follows:

(1) By the owner and charterer of The Russell-Poling No. 27 against The Christine Moran, her owner, charterer, etc., the barge Seaboard No. 99 and her owner. The claimant of The Christine Moran and the Seaboard Shipping Corporation, the owner of The Seaboard No. 99, filed petitions impleading the tug Coral Sea, her charterer, etc.;

(2) By the Seaboard Shipping Corporation as owner of the barge Seaboard No. 99 against The Christine Moran and her owner, wherein the claimant and operator of the tug Christine Moran impleaded the tug Coral Sea, her charterer, Russell Brothers Towing Co., the barge Russell-Poling No. 27 and the owner and charterer of the barge;

(3) By the Cities Service Oil Company as cargo owner of the oil aboard the barge Russell-Poling No. 27 against the tug Christine Moran, her owner and operator for cargo damage. The claimant of the tug Christine Moran filed a petition impleading the tug Coral Sea, her tow, the barge Russell-Poling No. 27, their respective owners, charterers, etc.;

(4) By the Seaboard Shipping Corporation, owner of the cargo on the barge Seaboard No. 99, against the barge Russell-Poling No. 27, her owner and charterer, wherein the latter appeared and filed a petition impleading the tug Christine Moran, her owner and operator.

The collision of the two barges occurred after the two tugs had safely passed each other starboard to starboard at a distance of about 300 feet.

The principal issue centers about the fault, if any, of the tug Christine Moran. The tug Coral Sea concedes that she was at fault and that her tow, The No. 27, sheered in the direction of, and collided with, The No. 99 in tow by The Christine Moran. All litigants are now in agreement that there was no fault on the part of either of the colliding barges. Thus the issue that remains is whether The Coral Sea was solely responsible for the accident or whether this is a "both-to-blame" case. The Coral Sea, of course, contends that The Christine Moran was also at fault; and, contrariwise, the tug Christine Moran contends that the collision was due solely to tug Coral Sea's failure to maintain control of its tow, The No. 27, so that she sheered into the path of The No. 99.

The case presents the usual situation of divergence of witnesses' estimates of distance, relative positions, areas and

point of collision.[1]  But one essential fact emerges clearly upon an appraisal of the credible evidence: that the collision was head-on bow-to-bow.  In the language of one of the witnesses, "Right smack center, * * * nose to nose. *. * * Couldn't go any better if you measured it off with a ruler. * * * Heading right on for one another, just like you would with your automobile and you see another car coming straight at you." (Transcript of Record, pp. 26–31.)

That The No. 27 sheered to her starboard in the direction of The No. 99 is conceded.  I am persuaded that The No. 99 also took a starboard sheer in the direction of The No. 27, resulting in the head-on bow-to-bow smash of the barges which could not have occurred in this manner except for the fault of both tugs. The situation as I see it is no different from that of two cars proceeding in opposite directions which collide.  If only one car veered off its side of the road and crossed to the other side, it is difficult to encompass a center head-on collision, radiator-to-radiator; rather, the offending car would strike the other at an angle.

■ Here the master of The Christine Moran did attempt to make a claim that The No. 27 struck the bow of The No. 99 at a slight angle—less than 45°.  But the overwhelming weight of the credible evidence and the physical condition of the damaged barges negate his version. The testimony fully warrants the conclusion that it was a head-on collision which could only have occurred if The No. 99 as well as The No. 27 had sheered to starboard.  The sheer of each reflected a failure of duty of each tug to keep its tow under control and straight behind.[2]

■ The Christine Moran was further at fault in proceeding at full speed and without taking precautionary measures following the failure of her master to observe, at and prior to the collision, the bow light of The Coral Sea's tow, The No. 27, which was lit and visible. The neglect here is emphasized by the master's admission that when The Coral Sea opened up her running lights he was uncertain as to whether she had two or three staff lights; that he failed to use glasses which were available to him, remaining in doubt as to whether the tug had the tow astern or alongside.  As the tugs passed one another the master of The Christine Moran picked up the stern light of The Coral Sea's tow, the barge No. 27, but did not see her bow light and he was still in the dark as to the tow's location.  In an effort to place her he played his searchlight, and it was then that he actually first saw The No. 27. Immediately he gave the danger signal, but it was much too late.  The No. 27 was then sheering in the direction of his tow, the barge No. 99, which was likewise sheering towards the former; and although each tug was put to hard port. the collision of the barges was inevitable.

■ No explanation has been offered for the master's failure to observe The No. 27's bow light which would have given him information as to whether she had been sheering from port to starboard.  It is significant that the claim advanced upon the trial, that The No. 27 carried no bow light, has been abandoned. It is now conceded that she had all required regulation lights, as did The Coral Sea.  The failure of the master, who was in the wheel room but not at the wheel, to make this observation must be ascribed to lack of vigilance.[3]  Under

---

1.  Cf.  The Edward P. Meseck, 2 Cir., 35 F.2d 866; The John Craig, D.C., 66 F. 596; The Erandio, D.C., 163 F. 435.

2.  The Ashbourne, 2 Cir., 181 F. 815; The Perseverance, 2 Cir., 1933, 63 F.2d 788, certiorari denied, Cornell Steamboat Co. v. Lavender, 289 U.S. 744, 53 S.Ct. 692, 77 L.Ed. 1490; The Overbrook, 2 Cir., 1931, 47 F.2d 593, 1931 AMC 630;

The Aurora, 2 Cir., 1919, 258 F. 439, 441; The Wrestler, 2 Cir., 1916, 232 F. 448, 450; Harris v. Sabine Transportation Co., 5 Cir., 202 F.2d 537.

3.  Cf.  Dahlmer v. Bay State Dredging & Contracting Co., 1 Cir., 26 F.2d 603, 605; McAllister Bros. v. The James J. Murray, D.C., 42 F.Supp. 62, 63, affirmed without opinion 2 Cir., 127 F.2d 291.

such circumstance the absence of a properly posted lookout created a presumption of contributory fault which could only be overcome by proof that the neglect could not have contributed to the collision.[4] The assumption must be that had a lookout been stationed on the bow he would have performed his duty in a prudent manner. A vigilant lookout observing the lights on the tow of The Coral Sea would have been informed of her movements and position and so taken all necessary precautions to prevent the collision.

■ The Christine Moran contends that she cannot be charged with fault because she had no lookout on the bow; that, in fact, the master acted in this capacity from his position in the pilot house. If he did, the very fact that he failed to observe the bow light carries with it either an inference that he was not in a position to see everything that a lookout stationed on the bow would have seen, or that he was not a careful and efficient lookout. The Courts have held that good navigation requires that moving vessels shall maintain a careful and efficient lookout. "[H]e must be properly stationed on the forward part of the vessel and must be held to a high degree of vigilance in that position. Neither the captain nor the helmsman in the pilot house can be considered to be 'lookouts' within the meaning of the maritime law."[5]

■ The Christine Moran also seeks to fix sole liability upon The Coral Sea on the ground that the latter's hawser exceeded the limit of 75 fathoms for the waters in the area of the collision. However, it appears that The Christine Moran, as well as The Coral Sea, offended in exceeding the permissible limit. Thus The Christine Moran had the burden of proving not only that her fault in that respect did not contribute to the collision, but that it could not have contributed to the collision[6]—a burden which it has failed to sustain.

Upon all the evidence and an appraisal of those witnesses who appeared and testified in open Court, I make the following

Findings of Fact.

(1) The parties are respectively the owners, operators, charterers, or managing agents of the vessels as alleged in their respective pleadings or the owner of the cargo therein alleged or referred to.

(2) (a) At all material times the tug Christine Moran was a Diesel tug, length 102 feet, beam 24.8 feet, gross tonnage 183 tons, and 1250 horse power.

(b) The tug Coral Sea was a Diesel tug, length 109 feet, beam 26 feet, gross tonnage 186 tons, and 1000 horse power.

(c) The steel barge, Russell-Poling No. 27, length 194 feet, beam 36 feet, equipped with two skegs at her stern, with a ship shaped bow, was without motive power or rudder, and was fully laden with a cargo of oil owned by the Cities Service Oil Company.

(d) The steel barge Seaboard No. 99, length 218 feet, beam 43 feet, with a square bow but raked at bow and stern, was without motive power or rudder, was not equipped with skegs, and was deeply laden with a cargo of oil.

(3) At 9:10 P.M., October 16, 1949, and thereafter to the time of the collision, the night was dark but clear, visibility was good, the wind was moderate northeast, the tide in the River Thames was ebb and running at full strength about two to two and a quarter knots in a southerly direction. The current in the area of Long Island Sound where the collision occurred was ebb and running at about three knots in an easterly direction.

4. Cf. Poling Russell, Inc., v. United States, 2 Cir., 196 F.2d 939; United States v. The Adrastus, 2 Cir., 190 F. 2d 883; Gulf Oil Corporation v. The Socony No. 16, 2 Cir., 162 F.2d 869.

5. Dahlmer v. Bay State Dredging & Contracting Co., 1 Cir., 26 F.2d 603, 605.

6. The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 136, 22 L.Ed. 148; Lind v. United States, 2 Cir., 156 F.2d 231.

(4) (a) For some time during the afternoon of October 16, 1949, and until the collision occurred, the tug Coral Sea had the barge Russell-Poling No. 27 in tow astern on a single hawser and bridle so that the barge was riding bow first about 600 feet aft of the tug. The hawser ran from the stern of the tug to a bridle 30 feet long attached to the bow of The No. 27.

(b) At all material times, The Christine Moran had the barge Seaboard No. 99 in tow astern on a single hawser and bridle so that the barge was riding bow first about 420 feet to 510 feet aft of the tug. The hawser from the stern of The Christine Moran was connected with a "V" shaped bridle at the bow of The No. 99.

(5) Each of said tugs displayed the proper and required lights, as did the barges. Each tug had an experienced pilot at the wheel of the tug, but neither tug had any lookout. The absence of such lookout on each of the tugs contributed to the collision.

(6) At or about 9:10 P.M. on October 16, 1949, the tug Christine Moran, with the loaded barge Seaboard No. 99 in tow astern, departed from Ballards Oil Dock, Groton, Connecticut, situated on the easterly side of the Thames River, bound for Weatherfield, Connecticut, and was proceeding down and out of the mouth of the Thames River. Her intention was to round Sarah Ledge Buoy on her starboard side and then proceed westerly into Long Island Sound and then into the Connecticut River.

(7) (a) The Coral Sea first observed The Christine Moran at or about the time she pulled away from Ballards Oil Dock, heading southerly down the Thames with her tow. The barge No. 99 was not visible to Langfeldt, the mate of The Coral Sea who was then at the wheel, but he knew The Christine Moran had a tow astern as he observed her three staff lights and the other required lights.

(b) The Coral Sea, when Langfeldt first observed The Christine Moran, was about a quarter of a mile southwest of Sarah Ledge Buoy area on a course turning to port toward the entrance to the channel of the Thames River, heading for the anchorage ground to the westward of the channel where she intended to shorten her hawser. She was then proceeding at approximately five knots. The Christine Moran when so first observed by Langfeldt was approximately two and a half miles upon the Thames River.

(c) The Coral Sea with The No. 27 in tow proceeded on her rounding course, and as The Coral Sea rounded Sarah Ledge Light The No. 27 sheered slightly to port and then to starboard; when The No. 27 had cleared the Sarah Ledge Buoy, The Coral Sea reduced her speed from five knots to about two knots approaching the anchorage and continued at that reduced speed until The Christine Moran sounded a danger signal after the sterns of the two tugs had passed one another on a starboard-to-starboard passage; then The Coral Sea went hard port full steam ahead to pull away from The No. 99.

(8) (a) The Coral Sea was first seen by Brittain, master of The Christine Moran, when The Christine Moran was about 150 yards northeast of a green flashing buoy, indicated as "Fl G 5" on map 359, United States Coast Guard and Geodetic Survey. She was proceeding down the Thames River at full speed, five or six knots.

The Coral Sea having passed the Sarah Ledge Buoy in her rounding course to port was then approximately one and a half miles down from The Christine Moran. Brittain knew that the vessel was heading toward the anchorage.

(b) As The Christine Moran proceeded down the channel, the rounding course of The Coral Sea was indicated to, and observed by, Brittain, for he saw the sequence of her running lights. First he observed her red light, and as The Coral Sea gradually turned to her own port she showed both running lights, then shut out her red light and showed only her green light.

Brittain could not determine whether The Coral Sea was carrying two or three staff lights. He was in doubt as to whether the tug had a tow astern or alongside. The Christine Moran continued down the channel at full speed.

(9) (a) At a point in the channel to the west of New London Ledge Light, at Southwest Ledge, The Christine Moran and The Coral Sea passed one another starboard to starboard at a distance of approximately 300 to 350 feet. No passing signals were exchanged by the tugs. The tug Christine Moran sounded a greeting signal as the tugs passed, which was answered by The Coral Sea. The Coral Sea then was headed northerly and The Christine Moran was proceeding southerly. The Christine Moran and her tow were proceeding full speed ahead, which was about five to six knots over the ground. The Coral Sea and her tow were making about two knots headway over the ground.

(b) After the tugs had passed one another, Brittain picked up the stern light of the barge Russell-Poling No. 27 but did not see her bow light. He observed The Russell-Poling No. 27 for the first time when he put his searchlight upon her and sounded a danger signal, whereupon each tug turned hard to her port at full speed in an effort to avoid a collision of their respective barges, The No. 27 and The No. 99, which were then sheering to starboard and heading for one another. But the danger signal was much too late and the barges collided head-on. The white bow light on the barge Russell-Poling No. 27 was lit and visible at the time Brittain observed The No. 27's stern light. The bow light was not seen by Brittain or anyone aboard the tug Christine Moran at or before the collision.

(c) The collision occurred at or about 9:40 P.M. on October 16, 1949, at a point somewhat south of where the tugs had passed one another, which may be generally designated as southwest of the New London Ledge Light at Southwest Ledge.

(10) As a result of the head-on collision between the two barges, the hawsers to their respective tugs were parted; the bow of the barge Russell-Poling No. 27 was damaged, she filled, went down by the bow and settled at a point approximately 230 to 234 degrees magnetic and about 1300 yards from the New London Ledge Light; the bow of The Seaboard No. 99 was damaged; a portion of the oil cargo aboard the barge No. 27 was damaged or lost. No damages were sustained by either the tug Coral Sea or the tug Christine Moran.

Conclusions of Law.

(1) This Court has jurisdiction of the subject matter and the parties to this action.

(2) The collision between the barges was not due to any fault on the part of either of said barges or the make-up of the tow.

(3) The collision was due to the mutual and concurrent faults of the tugs Coral Sea and Christine Moran in their neglect (a) in failing to keep the respective tows under control and from sheering and coming into collision; (b) in causing, or not taking the necessary precautions to prevent, a collision between their tows; (c) in failing to have lookouts stationed.

(4) The tug Christine Moran was further at fault (a) in failing to observe the white bow light on the barge Russell-Poling No. 27 and thereby be timely advised of the position and sheering of that barge; (b) in proceeding full speed ahead, when according to her master he saw only the stern light of The Russell-Poling No. 27; (c) and in proceeding full speed ahead after he saw The Coral Sea but was uncertain of the location or position of its tow, The Russell-Poling No. 27.

(5) That in each of the above-entitled proceedings an appropriate interlocutory decree and order of reference should be entered in favor of the respective libelants against both the tugs Christine Moran and The Coral Sea, and their re-

spective claimants and stipulators, with costs, and that all petitions, or libels, against the barges Seaboard No. 99 and The Russell-Poling No. 27, their claimants, operators or charterers, be dismissed with costs. In view of the above, the cross-libel of the Seaboard Shipping Corporation (A.164–85) is dismissed, without costs, as its subsequent action (A.167–73) makes the former unnecessary.

